PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1687
_____

LISA M. FOLAJTAR,

                                        Appellant
                        v.

ATTORNEY GENERAL OF THE UNITED STATES;
ACTING DIRECTOR, BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND EXPLOSIVES;
DIRECTOR OF THE FEDERAL BUREAU OF
INVESTIGATION; UNITED STATES OF AMERICA
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 5-18-cv-02717)
District Judge: Honorable Joseph F. Leeson, Jr.
_____

Argued November 12, 2019

Before: AMBRO, KRAUSE, and BIBAS, Circuit Judges
(Opinion filed: November 24, 2020)

Adam J. Kraut
Joshua Prince (Argued)
Prince Law Offices
646 Lenape Road
Bechtelsville, PA  19505

       Counsel for Appellant

Joseph H. Hunt
Assistant Attorney General
William M. McSwain
United States Attorney
Mark B. Stern
Patrick Nemeroff (Argued)
Thais-Lyn Trayer
United States Department of Justice
Civil Division, Room 7217
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

       Counsel for Appellees

Joseph G.S. Greenlee
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA  95814

         Counsel for Amicus Appellants
         Firearms Policy Coalition Inc.; Firearms Policy
         Foundation; Firearms Owners Against Crime; Second
         Amendment Foundation Inc.

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Lisa Folajtar asks us to decide whether Congress may prohibit individuals convicted of federal tax fraud from possessing firearms. To answer this question, we rely on the general rule that laws restricting firearm possession by convicted felons are valid. Because we find no reason to deviate from this longstanding prohibition in the context of tax fraud, we reject Folajtar's as-applied constitutional challenge.

Folajtar pled guilty in 2011 to a federal felony: willfully making a materially false statement on her tax returns, which is punishable by up to three years' imprisonment and a fine up to $100,000. 26 U.S.C. § 7206(1).[1] The Court was more

---

[1] Section 7206 is titled "[f]raud and false statements," and § 7206(1) is titled "[d]eclaration under penalties of perjury." We colloquially refer to any offense under § 7206, including § 7206(1), as criminal tax fraud. *See* Ray A. Knight & Lee G. Knight, Criminal Tax Fraud: An Analytical Review, 57 Mo. L. Rev. 175, 179 (1992); *see also Kawashima v. Holder*, 565 U.S. 478, 483–84 (2012) (explaining that although § 7206(1) does not include fraud as a formal element, it qualifies under the Immigration and Nationality Act as a deportable offense involving fraud or deceit); *United States v. Taylor*, 574 F.2d 232, 234 (5th Cir. 1978) ("Section 7206(1) is a fraud statute.").

lenient, sentencing her to three-years' probation, including three months of home confinement, a $10,000 fine, and a $100 assessment. She also paid the IRS over $250,000 in back taxes, penalties, and interest. Folajtar's conviction left her subject to 18 U.S.C. § 922(g)(1), which prohibits those convicted of a crime punishable by more than one year in prison[2] from possessing firearms.[3] Congress enacted the prohibition in the 1960s, thus expanding substantially a 1938 ban prohibiting

[2] Because the charge associated with § 922(g)(1) is a "felon in possession of a firearm," some refer to any crime subject to § 922(g)(1) as a felony. When we use the term "felony," we are typically referring to offenses labeled as a felony by Congress or the relevant state legislature. The federal definition of a felony is "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. §§ 922(g)(1), 3559(a). States vary in their definition of a felony. Section 922(g)(1) applies to federal felonies and state convictions (regardless of label) that satisfy the federal definition of a felony, although it excludes state misdemeanors punishable by a term of imprisonment of two years or less. *See id.* §§ 921(g)(1), 921(a)(20)(B).

[3] Section 922(g)(1) is part of a statutory scheme that also bars eight other groups of persons from possessing guns, including fugitives, drug addicts, persons previously committed to mental institutions, persons under a court order prohibiting them from threatening a partner or child, those with misdemeanors or convictions for crimes of domestic violence, undocumented or non-immigrant aliens, persons dishonorably discharged from the military, and persons who have renounced their United States citizenship. *Id.* § 922(g).

those convicted of "crimes of violence"[4] from receiving a firearm. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 925, 82 Stat. 197, 233–34; *id.* at tit. VII § 1202, 82 Stat. at 236 (codified at 28 U.S.C. § 922(g)(1)).

In 2018, Folajtar filed a lawsuit in the District Court asserting that applying § 922(g)(1) to her violated her Second Amendment right to possess firearms. The Government moved to dismiss Folajtar's suit, arguing that, "[b]ecause Folajtar pleaded guilty to a federal felony, she is categorically excluded from the class of citizens entitled to possess a firearm." App. Vol. II*,* 26. Applying our precedents in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), and *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), the District Court determined that Folajtar did not state a plausible Second Amendment claim because she was convicted of a serious crime. She appeals to us.

The District Court had jurisdiction over Folajtar's constitutional challenge under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the dismissal of Folajtar's complaint under Fed R. Civ. P. 12(b)(6). *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). Consistent with our precedents, we hold that the legislature's designation of an offense as a felony

---

[4] The statute in 1938 defined "crime of violence" as murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking and various types of aggravated assault. *See* Federal Firearms Act, ch. 850, § 1(6), 52 Stat. 1250, 1250 (1938).

is generally conclusive in determining whether that offense is serious. Because we determine the felony here is a serious crime, Folajtar is not protected by the Second Amendment, and her as-applied challenge to § 922(g)(1) fails.

    *A. Those who commit serious crimes are excluded from the Second Amendment's protections.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court interpreted the Amendment's right to bear arms as an individual right, at least for the core purpose of allowing "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

But that right "is not unlimited." *Id.* at 626. *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626–27). To the contrary, among the many "presumptively lawful regulatory measures" that it identified in *Heller*, the Court included "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms."[5] *Id.* at 626–27; *see also Doe v.*

---

[5] While in a footnote *Heller* characterized this list of "longstanding prohibitions" as "presumptively" lawful, 554

6

*Governor of Pennsylvania*, 977 F.3d. 270, 274 (3d Cir. 2020) ("We have consistently hewed to the exceptions that *Heller* preserved."). Indeed, the Supreme Court has repeatedly endorsed the constitutionality of measures prohibiting firearm possession by felons after *Heller*. *See McDonald*, 561 U.S. at 786 ("We repeat [*Heller*'s] assurances here."); *see also New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., dissenting) (recognizing historical support for constitutionality of banning firearm possession by felons); *Vartelas v. Holder*, 566 U.S. 257, 271 (2012) (referencing *Heller*'s approval of laws prohibiting felons from having arms).

Since *Heller*, we, along with every court to consider the issue, have rejected challenges that § 922(g)(1) on its face violates the Second Amendment. *See United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011), *overruled on other grounds by Binderup*, 836 F.3d at 349; *see also United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013) (per curiam); *Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013); *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United*

U.S. at 627 n.26, *McDonald* reaffirmed the constitutionality of these "regulatory measures" without any qualifying language, 561 U.S. at 786. We understand *Heller*'s presumption language as leaving open the possibility that a truly exceptional "felony" may fall outside the scope of the historical bar and follow the same approach here.

7

*States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *cf. United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("Because Congress's prohibition on felon possession of firearms is constitutional, it follows that the burdens associated with the congressionally-created expungement exception in 18 U.S.C. § 921(a)(20) do not violate the Second Amendment."). Thus § 922(g)(1) is constitutional as written.

We do, however, permit Second Amendment challenges to § 922(g)(1) as applied to individuals, *Barton*, 633 F.3d at 172–73, which we analyze using a two-pronged approach first announced in *Marzzarella*, 614 F.3d at 89. *See Holloway v. Att'y Gen.*, 948 F.3d 164, 171 (3d Cir. 2020); *Binderup*, 836 F.3d at 356. First, the challenger bears the burden of showing that the law hampers "conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. Over time we have refined this prong to require the challenger to "(1) identify the traditional justifications for excluding from Second Amendment protections the class of which [she] appears to be a member, and then (2) present facts about [her]self and [her] background that distinguish [her] circumstances from those of persons in the historically barred class." *Binderup*, 836 F.3d at 347 (citing *Barton*, 633 F.3d at 173–74). If the challenger cannot meet her burden at Step One—*i.e.*, she cannot distinguish herself from the historically barred class—our inquiry is complete and her challenge fails. But if the challenger can distinguish herself, we continue to Step Two, with the burden shifting to the Government to show that the law can survive heightened scrutiny. *Id.* at 347–48.

8

Until now we have not had to decide whether § 922(g)(1) is unconstitutional as applied to a felony conviction. However, we have twice considered whether the provision is unconstitutional as applied to state misdemeanor convictions. *See Holloway*, 948 F.3d 164; *Binderup*, 836 F.3d 336. As noted, we typically would proceed under the first step of *Marzzarella* to determine: (1) whether persons with felony convictions fall within the historical class of those barred from Second Amendment protection; and (2) whether Folajtar, as one convicted of a federal tax fraud felony, can distinguish herself from that class. As we explain below, our precedents instruct we can collapse these two questions into one: Has the plaintiff overcome the generally conclusive rule that a felony conviction is serious, so that it falls outside the historical class of offenses that render felons excluded from Second Amendment protections?

In looking to the historical justification for limiting the right to bear arms, we have recognized that many scholars agreed that "the right to bear arms was tied to the concept of a virtuous citizenry[;] . . . accordingly, the government could disarm 'unvirtuous citizens.'" *Binderup*, 836 F.3d at 348 (citation omitted); *see also Vongxay*, 594 F.3d at 1118. Also, "[s]everal of our sister circuits endorse[d] the 'virtuous citizen' justification for excluding felons and felon-equivalents from the Second Amendment's ambit." *Binderup*, 836 F.3d at 348 (collecting cases). We reasoned that people who committed or were likely to commit violent offenses "undoubtedly qualify as 'unvirtuous citizens' who lack Second Amendment rights." *Id.* Further, citing *Heller*'s "longstanding prohibitions on the possession of firearms by felons," we concluded that "[t]he category of 'unvirtuous citizens' is thus broader than violent criminals; it covers any person who has committed a serious

9

criminal offense, violent or nonviolent." *Id.* (citing *Heller*, 554 U.S. at 626).

Accordingly, we held that "persons who have committed serious crimes forfeit the right to possess firearms much the way they 'forfeit other civil liberties, including fundamental constitutional rights [e.g., the right to vote].'" *Id.* at 349 (quoting *Barton*, 633 F.3d at 175). While our dissenting colleague and Folajtar attempt to define the category of those excluded from Second Amendment protection solely by "dangerousness," we made clear in *Binderup* that the exclusion applies to all serious crimes, and there ten judges agreed that "the correct test at step one for challenges to § 922(g)(1) is whether the offense is 'serious,' not whether the offense is violent." *Holloway*, 948 F.3d at 171 n.7. When examining the seriousness of a crime, we "presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise." *Binderup*, 836 F.3d at 351.

> *B. Our precedents explain that the legislature's designation of an offense as a felony is generally conclusive when evaluating seriousness.*

There are "no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights." *Id.* In *Binderup*, where we held that § 922(g)(1) was unconstitutional as applied to a challenger convicted of the state misdemeanor of corrupting a minor (a consensual sexual relationship with a 17 year old employee) and another who unlawfully carried a handgun without a license, we observed that the legislatures classified the challengers' offenses as misdemeanors, the crimes were nonviolent, the punishments

10

imposed were lenient, and other jurisdictions also classified similar crimes as misdemeanors. *Id.* at 351–53. In *Holloway*, we also considered dangerousness of the offense when applying this approach to reject an as-applied challenge to another misdemeanor conviction—a DUI. 948 F.3d at 173–77.[6]

Contrary to what the dissent suggests, *see* Dissenting Op. 2, we have never held that felonies and state misdemeanors should be analyzed similarly or that the considerations we examined in *Binderup* and *Holloway* should be weighed equally. Instead, we consistently viewed the legislature's classification of the offense as a powerful consideration. *Binderup*, 836 F.3d at 352 (explaining the legislature's label for an offense is a "powerful expression" of its view). Our decision in *Binderup* was "limited to the cases before us, which involve[d] state-law misdemeanants . . . . This is important because when a legislature chooses to call a crime a misdemeanor, we have an indication of non-seriousness that is lacking when it opts instead to use the felony label. We [were] not confronted with whether an as-applied Second Amendment challenge can succeed where the purportedly disqualifying offense is considered a felony . . . ." *Id.* at 353 n.6. And while the dissent is correct we left the issue of disarming felons open, *see* Dissenting Op. 5, we remarked that while a successful as-

---

[6] A blink response may be that violence and dangerousness are the same. Though there is overlap, they are not. In *Binderup*, we described the consideration of "violence" as whether "the offense had the use or attempted use of force as an element." 836 F.3d at 352. In *Holloway*, we clarified that certain offenses like DUIs are dangerous although the "use or threatened use of violence is not an element of [the crime]." 948 F.3d at 174.

11

applied challenge by a felon is possible, the challenger's burden would be "extraordinarily high." *Id.* Thus the legislature's decision to label an offense a felony is generally conclusive in our analysis of seriousness, and while we do not foreclose the possibility that a legislature could be overly punitive and classify as a felony an offense beyond the limits of the historical understanding, a "non-serious felony" would be rare.[7]

Our differing treatment of felonies and misdemeanors remains true to *Heller*'s instruction that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful regulatory measures" constraining the scope of the right. 554 U.S. at 626–27 & n.26; *Barton*, 633 F.3d at 171 ("*Heller*'s list of 'presumptively lawful' regulations is not dicta."); *see also Binderup*, 836 F.3d at 359 n.3 (Hardiman, J., concurring in part) (reading *Heller*'s discussion of lawful regulations as a limitation integral to its holding).[8]

---

[7] In *Binderup*, the dissent argued that all crimes subject to § 922(g)(1) are disqualifying because their maximum possible punishment was conclusive proof of their seriousness. That, we said, "puts the rabbit in the hat" because some misdemeanors "may be 'so tame and technical as to be insufficient to justify the ban.'" *Binderup*, 836 F.3d at 350 (quoting *Torres–Rosario*, 658 F.3d at 113).

[8] While our dissenting colleague attempts to cast doubt on *Heller*'s general exclusion of felon disarmament laws from the scope of the right to arms, labeling it an "aside," Dissenting Op. 5, that characterization falls far short of reality. Recall that the Supreme Court reaffirmed two years later in *McDonald* that

12

This approach further aligns with our earlier reasoning that "[m]isdemeanors are, and traditionally have been, considered less serious than felonies." *Id.* at 351 (quoting *Baldwin v. New York*, 399 U.S. 66, 70 (1970)). The latter "were—and remain—the most serious category of crime [as] deemed by the legislature." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (Sentelle, J.).

Our approach is also consistent with that of our sister circuits and state courts. *See id.* at 155 ("[N]o circuit has held the law unconstitutional as applied to a convicted felon."); *see also id.* at 154 ("[F]elons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment."); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1498 (2009) (collecting cases) ("Dozens of state court decisions likewise take the view that felons (even those convicted of nonviolent felonies) lack a constitutional right to keep and bear arms."). Thus, while those convicted of felonies may bring as-applied challenges to § 922(g)(1), they are unlikely to succeed in all but the exceptional case.

As we elaborate below, the precedents of the Supreme Court, our and other circuits, which hold that felonies are serious enough to ban firearm possession, find support in history and the general deference courts accord to a legislature's policy determination of what is serious.

---

it "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786.

13

*1.  History confirms that felons committed serious crimes.*

A felony unquestionably encompasses a broader array of crimes today than it did in 1791.  Nonetheless, at the Second Amendment's ratification felonies comprised "the most serious category of crime[s,]" just as they do now.  *Medina*, 913 F.3d at 158 (citing *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)).  We inherited the term from England, where in its earliest form it referred to a "breach of the feudal obligations between lord and vassal," the consequence of which was "forfeiture of goods and the escheat of the fief."  Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic, 57 Clev. St. L. Rev. 461, 463 (2009).  As the term evolved to refer to a broader category of crimes, felons faced serious consequences: From at least twelfth-century on in England, felonies were punishable by death or the loss of goods and land.  *Id.* at 463–64.

Although the number of felonies at common law is limited,[9] legislatures quickly began to expand the list.  Francis Bacon, writing in the seventeenth century, lists at least thirty-four felonies punishable by death and forfeiture.  Many of these crimes are violent, such as burglary, rape, arson, and murder; but others are not, including unlawful hunting and repeated forgery.  *See* Francis Bacon, Preparation for the Union of Laws

---

[9] The nine traditional felonies at common law are murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny.  *See* Tress, *supra*, at 464 (citing Francis Wharton, Treatise on the Criminal Law of the United States 1 (Philadelphia, James Kay, Jun. & Brother 1846)).

of England and Scotland, in 2 The Works of Francis Bacon 163–64 (Basil Montagu ed., Cary & Hart 1844); *see also Medina*, 913 F.3d at 158 (citing 4 William Blackstone, Commentaries on the Laws of England \*95 (Harper ed. 1854)). Harsh punishment for felonies continued into the eighteenth century even as the number of crimes that qualified expanded. Blackstone writes that "no less than a hundred and sixty [offenses] have been declared by act of parliament [ ] to be felonies." 4 William Blackstone, Commentaries \*18.

American colonists imported the English concept of felonies and their consequences into their legal systems. The death penalty was ubiquitous in the Founding Era, *see Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (citing Stuart Banner, The Death Penalty: An American History 23 (2002)), used even to punish non-violent felonies such as forgery and horse theft. *Medina*, 913 F.3d at 158 (citing Banner, *supra*, at 18); *see also* John D. Bessler, Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment 56–57 (2012) (listing crimes the First Congress made "punishable by hanging, including treason, murder on federal land, forgery, [dealing in] forged securities, counterfeiting, and piracy on the high seas"); Kathryn Preyer, Penal Measures in the American Colonies: An Overview, 26 Am. J. Legal Hist. 326, 330–32, 342, 344, 345–47 (1982) (discussing the use of capital punishment in eighteenth-century Virginia, Massachusetts, Pennsylvania, and New York). The widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes.

15

Given this, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. Americans in the Founding Era also believed "[i]t is because the people are civilized, that they are with safety armed." David B. Kopel, The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement, 104 J. Crim. L. & Criminology 761, 794 (2014) (quoting the diplomat and Jeffersonian Republican Joel Barlow). They saw the armed citizenry, in other words, as a bulwark of liberty, *see* Robert E. Shalhope, The Armed Citizen in the Early Republic, 49 Law & Contemp. Probs. 125, 131–32 (1986), in contrast to felons who could not be trusted, *see* Kopel, *supra*, at 789 n.154 (noting that under English law the sheriff could traditionally summon armed citizens to pursue fleeing felons, including thieves). Thus, the eighteenth-century American's right to bear arms was intimately tied to long-standing practices that explicitly separated the class of armed law-abiding citizens from felons. "[N]o one . . . denies these historically grounded and sensible explanations behind the exceptions: Legislatures have authority . . . to impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction[.]" *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (Sutton, J., concurring).

By the turn of the nineteenth century, Americans began to revise the penalties for felonies, reducing their severity and increasing the use of incarceration. *See* Tress, *supra*, at 473. The First Congress outlawed forfeiture of estate as a punishment for felons under federal law. *Austin v. United States*, 509 U.S. 602, 613 (1993). States passed laws replacing capital punishment with incarceration, using the term "felony"

16

to denote crimes that required time in prison to "reform[] [ ] the convict's character," in contrast to less serious crimes "that only required a sharp reminder to obey the law." Tress, *supra*, at 468. The punishment for felons extended to forfeiture of certain fundamental rights, including the right to vote. *See Richardson v. Ramirez*, 418 U.S. 24, 51 (1974) (noting that the act admitting Arkansas in 1868 provided it could disenfranchise those convicted of felonies at common law "as a punishment for such crimes."). Thus, even as the term evolved and expanded, felonies continued to reflect the category of serious crimes committed by those outside the virtuous citizenry.

### 2. *Our approach accords proper deference to the legislature's determination.*

Our approach is not only consistent with history and tradition, but further safeguards the separation of powers by allowing democratically constituted legislatures, not unelected judges, to decide in most cases what types of conduct reflect so serious a breach of the social compact as to justify the loss of Second Amendment rights. "When the legislature," in this case Congress, "designates a crime as a felony, it signals to the world the highest degree of societal condemnation for the act," *Medina*, 913 F.3d at 160. In upholding Congress's decision to disarm individuals who commit felonies, we respect the legislatures' choices about which crimes count as serious and preserve the states' traditional autonomy to "define crimes [and] punishments." *Danforth v. Minnesota*, 552 U.S. 264, 280 (2008). This ensures that disarmament decisions reflect the views and values of our communities, as well as the expertise and experience of legislatures "'far better equipped than the judiciary' to make sensitive public policy judgments."

17

*See Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (Easterbrook, J.) (observing that "the legislative role did not end in 1791" and that, in some cases, the Second Amendment "leav[es] to the people's elected representatives the filling in of details").

Indeed, we defer to the legislature's determination that individuals convicted of felonies may forfeit other fundamental rights, such as the right to vote and to sit on a jury, the former being the essence of our democracy. *See* 28 U.S.C. § 1865(b)(5); *Richardson*, 418 U.S. at 56; *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote . . . is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). As felons are rarely protected by the Second Amendment, Congress is also normally entitled to require disarmament as a result of a felony conviction without engaging in an evaluation of each felon's rehabilitation and likelihood to engage in further criminal activity of any kind. *See Medina*, 913 F.3d at 160–61. Accordingly, Congress has the flexibility to decide which crimes are captured by § 922.[10] For instance, it

---

[10] Folajtar also cites 18 U.S.C. § 925(c), which allows those prohibited from possessing firearms under § 922(g)(1) to apply to the Attorney General for relief. We explained in *Binderup* that this program is "a matter of legislative grace; the Second Amendment does not require that those who commit serious crimes be given an opportunity to regain their right to keep and bear arms in that fashion." 836 F.3d at 350. Further, Congress's decision to defund the program exemplifies that a

18

determined that those convicted of antitrust felonies should not be covered by the statute because those crimes were only classified as felonies in a handful of states and were not felonies under federal law. *See* 18 U.S.C. § 921(a)(20)(A); S. Rep. No. 89-1866, at 77 (1966).

Practical considerations confirm the wisdom of this approach. Perhaps most important, our holding avoids the administrative difficulties that would result from applying a dangerousness standard to felonies. Should the dissent's proposal prevail, district courts would face the unenviable task of weighing the relative dangerousness of hundreds of offenses already deemed sufficiently serious to be classified as felonies. Would the selling of mislabeled food or drugs, for example, count as a dangerous offense? *See* 21 U.S.C. § 331. What about prescribing opioids without a legitimate medical purpose? *See* 21 U.S.C. § 841(a). Or allowing toxic chemicals to leach into a public waterway? *See* 33 U.S.C. § 1319(c)(2)(B).

This problem is not alleviated by describing the category as "crimes of violence" rather than "dangerous" offenses, as some have suggested. *See* Dissenting Op. 24; *Binderup*, 836 F.3d at 370 (Hardiman, J., concurring). "[I]ndeterminacy about how to measure the risk posed by a crime [and] indeterminacy about how much risk it

---

robust system of as-applied challenges to § 922(g)(1) is unworkable. *Id.* at 403 (Fuentes, J., concurring in part and dissenting in part) ("Congress effectively wr[o]te § 925(c) out of the statute books . . . [b]ecause it concluded that the task of granting individual applications for relief from § 922(g)(1) was too prone to error." (emphasis omitted)).

takes for the crime to qualify as a violent felony . . . produce[ ] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson v. United States*, 576 U.S. 591, 598 (2015); *accord United States v. Davis*, 588 U.S. ——, 139 S. Ct. 2319, 2336 (2019); *Sessions v. Dimaya*, 584 U.S. —— , 138 S. Ct. 1204, 1223 (2018). Under our approach, those who commit felonies are on notice that they are committing a serious offense, and, with rare exceptions, that they thereby forfeit their rights under the Second Amendment. By giving primary weight to the legislature's determination, our approach is no doubt more administrable.

### C. The dissent's focus on dangerousness alone is too narrow.

Even if we put aside administrative concerns, the dissent's position that only dangerousness should be considered in our analysis would raise serious institutional concerns given the clearly established precedents in our Circuit and elsewhere. And in any event the dissent adopts an overly narrow view of danger that is inconsistent with historical readings.

In addition to parting with the overwhelming consensus among our sister circuits*, see supra* 13, the dissent's standard would require us to ignore the Supreme Court's general exclusion of all felons from the scope of the Second Amendment right, *see Heller*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 786; contradict our own precedents making clear that seriousness of the offense defines the historical class for criminal offenses, *see Binderup*, 836 F.3d at 350 (Ambro, J.); *id.* at 387 (Fuentes, J., concurring in part and dissenting in

20

part); *Holloway*, 948 F.3d at 171; and stray too far into the province of the legislative branch. This we should not do.

The dissent is largely rehashing the same sources and arguments as Judge Hardiman's *Binderup* concurrence. *See* Dissenting Op. 6–9. But our Court has repudiated three times in just the past four years that concurrence's narrow focus on dangerousness. Ten of the fifteen judges to participate in *Binderup* rejected it, making explicit their conclusion was part of *Binderup*'s holding and not a dictum. *See* 836 F.3d at 356 ("[T]he following is the law of our Circuit . . . . [A] challenger must prove that he was not previously convicted of a *serious* crime[.]" (emphasis added)). A subsequent panel of our Court similarly recognized that "the historical justification for disarming felons was because they had committed serious crimes, [and the] risk of violent recidivism was irrelevant." *Beers v. Att'y Gen.*, 927 F.3d 150, 156 (3d Cir. 2019), *judgment vacated on other grounds*, *Beers v. Barr*, 140 S. Ct. 2758 (Mem.) (May 18, 2020).

And again, earlier this year, we reiterated that in *Binderup* "ten judges agreed that the correct test . . . is whether the offense is 'serious,' not whether the offense is violent." *Holloway*, 948 F.3d 171 n.7. If *stare decisis* means anything, it means that we cannot, without gravely impugning the stability and legitimacy of the judiciary, revisit the position so recently espoused by a majority of our *en banc* court and by two panels since. As the Chief Justice recently explained, *stare decisis* "must give way only to a rationale that goes beyond whether the case was decided correctly." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring). We see no such ground for

revisiting *Binderup*, *Beers*, or *Holloway* today, and the dissent highlights none.

We need not fully repeat the historical analysis in our precedents but note for completeness that the dissent's dangerousness standard is also inconsistent with history. While colonial Virginia permitted the constable to "take away Arms from such who ride, or go, offensively armed, in Terror of the People," and bring the person and their arms before a Justice of the Peace, *see* George Webb, The Office of Authority of a Justice of Peace 92–93 (1736), other colonies did not require violence or dangerousness for disarmament. For example, Connecticut prohibited those who defamed or libeled acts of Congress from keeping arms. *See* G.A. Gilbert, The Connecticut Loyalists, 4 Am. Hist. Rev. 273, 282 (1899). Similarly, Pennsylvania law required any "person [who] 'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state . . . to deliver up his arms to agents of the state, and he was not permitted to carry any arms about his person or keep any arms or ammunition in his 'house or elsewhere.'" Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004) (quoting Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126). Massachusetts also disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." *Id.* at 507 (quoting Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31, 31).[11]

---

[11] The dissent contends that these latter three laws were about dangerousness. Dissenting Op. 7–8. Not so. Refusing to

Later, at their ratification conventions, several states proposed amendments limiting the right to bear arms to *both* law-abiding *and* "peaceable" citizens. The Anti-Federalists in Pennsylvania issued the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, which proposed that "the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals . . . ." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971) (emphasis added). "*Heller* identified . . . [this report] as a 'highly influential' 'precursor' to the Second Amendment." *Binderup*, 836 F.3d at 349 (citation omitted). Other states proposed similar amendments. New Hampshire proposed that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion," *see* 1 Debates in the Several State Conventions on the Adoption of the Federal Constitution 326 (Jonathan Elliott ed., 2d ed. J.B. Lippincott 1891), and Massachusetts submitted that "the said Constitution be never construed . . . to prevent the people of the United States[] who are peaceable citizens . . . from keeping their own arms . . . ." *See* Schwartz, *supra*, at 681. While the dissent attempts to shoehorn all of these proposals and laws into the silo of dangerousness, a more accurate reading recognizes that while some ratification and legislative bodies at the Founding focused on the dangers that certain people posed, others

---

swear an oath, defaming acts of Congress, or failing to defend the colonies do not of themselves qualify as dangerous. The same is true of the examples cited by the dissent of refusing to swear allegiance or loyalty to the sovereign.

disarmed a broader portion of the populace based on "virtuousness" and the seriousness of the crime, just as we explained in *Binderup*. Neither we nor the dissent has unearthed any evidence that the laws or proposed amendments were then thought to be unconstitutional.

No doubt some of the laws at the Founding were concerned about dangerousness. The dissent's cherry-picked history only shows that dangerousness was one reason to restrict firearm possession, but it hardly was the only one. It is hence insufficient to highlight those laws disarming the dangerous when the constitutional coverage is broader.

The dissent claims that the felon-in-possession provision is wildly overinclusive. *See* Dissenting Op. 25. To the contrary, it is the dissent's dangerousness-focused approach that is wildly *underinclusive* in failing to explain many Founding Era firearms regulations. What concerned the Framers was that "virtuous citizens" retain the right to bear arms, *Binderup*, 836 F.3d at 348; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts. That is why Connecticut disarmed libelers, *see* Gilbert, *supra* at 282, and why Pennsylvania Anti-Federalists proposed stripping all criminals of the right to bear arms, *see* Schwartz, *supra* at 665. None of these restrictions narrowly target citizens who committed inherently violent or dangerous crimes.

And there is good reason not to trust felons, even non-violent ones, with firearms. As one of our sister circuits observed, nonviolent offenders are at higher propensity for committing violent crimes. *See Kanter v. Barr,* 919 F.3d 437, 449 (7th Cir. 2019) (noting several studies establishing a

connection between non-violent offenses and a risk of future violent crime). The dissent claims that these studies "lump tax fraudsters together with burglars and drug dealers[,]" Dissenting Op. 25, but supplemental tables to the U.S. Department of Justice report cited in *Kanter* clarified the data by explicitly separating fraud offenders from both burglars and drug offenders, as well as those who committed robbery or larceny. *See* Matthew R. Durose, et al., U.S. Dep't of Justice, Bureau of Justice Statistics, Supplemental Tables: Most Serious Commitment Offense and Types of Post-Release Arrest Charges of Prisoners Released in 30 States in 2005, at t.2 (2016). About thirty percent of burglars and twenty-five percent of drug offenders who were sentenced to at least a year of imprisonment were subsequently arrested for a violent crime within five years of their release from state prison, compared with about twenty percent of fraud or forgery offenders. *Id.* The dissent admits that "disarming burglars and drug dealers makes sense," Dissenting Op. 25, but the small difference in the risk of future violent crime between those crimes and fraud cannot support the dissent's position that the legislature can use these "rules of thumb" to disarm burglars and drug dealers, but not felons for fraud crimes.

As the dissent would have it, the Second Amendment mandates that those who have flouted the laws of the land and shown utter disregard for the welfare of their fellow citizens—felons like Bernard Madoff (convicted of various counts of fraud, perjury and money laundering in connection with the largest Ponzi scheme in history), Jeffrey Skilling (the CEO of Enron convicted of fraud and insider trading), and Jordan Belfort (author of The Wolf of Wall Street convicted of fraud and stock market manipulation)— must be trusted with a firearm if their felonies were "merely" white-collar (read non-

25

dangerous) crimes. The above-referenced laws reflect otherwise, and we decline to hold that legislatures may regulate only the firearm possession of dangerous felons when the constitutional coverage extends to all those who cannot be trusted to carry firearms responsibly because they committed serious crimes.

> ### D. *Folajtar does not overcome the general rule that her felony is a serious crime.*

As felony status is generally conclusive evidence that the offense is serious, we ask whether Folajtar's offense is so exceptional for it to fall outside the historical bar. She asserts that her felony conviction is distinguishable from the "longstanding prohibitions on the possession of firearms by felons" in *Heller*, 554 U.S. at 626, because it is not among the nine English common law felonies or the felony convictions requiring disarmament in the 1938 Federal Firearms Act. We are unpersuaded.[12] As we explained in *Binderup*, "the category of serious crimes changes over time as legislative

---

[12] Folajtar also urges us to reconsider our holding that the passage of time cannot restore a convicted felon's Second Amendment rights. As we are bound by *Binderup*, 836 F.3d at 349–350, we decline to consider this request as well. *See also Medina*, 913 F.3d at 160 ("Nor can [an individual's] present contributions to his community, the passage of time, or evidence of his rehabilitation un-ring the bell of his conviction."); *Hamilton*, 848 F.3d at 626 ("[E]vidence of rehabilitation, likelihood of recidivism, and passage of time are not bases for which a challenger might remain in the protected class of law-abiding, responsible citizen[s]." (internal quotation marks and citation omitted)).

judgments regarding virtue evolve." 836 F.3d at 351. Hence "exclusions need not mirror limits that were on the books in 1791." *Id.* (quoting *Skoien*, 614 F.3d at 641).

In any case, Folajtar's felony is not obviously less serious than the historical felonies as she would suggest. To violate 26 U.S.C. § 7206(1), a defendant must, while "under the penalties of perjury," submit a tax return that "[s]he does not believe to be true and correct as to every material matter." By making a tax return that she knew to be false, Folajtar willfully deprived the Government of its property. This act is no less serious than larceny, one of the nine common law felonies, or forgery, one of the first felonies in the United States. *See supra* 14–15; *see also Hamilton*, 848 F.3d at 627 ("Theft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law."); *Abdelqadar v. Gonzales*, 413 F.3d 668, 671 (7th Cir. 2005) (Easterbrook, J.) ("Crimes entailing deceit or false statement are within the core of the common-law understanding of 'moral turpitude.'"). Indeed, a conviction for violating § 7206(1) "necessarily entail[s] deceit." *Kawashima*, 565 U.S. at 485 (holding that a violation of § 7206(1) can be serious enough to be an aggravated felony and deportable offense under the Immigration and Nationality Act); *see also Jordan v. De George*, 341 U.S. 223, 229 (1951) (holding that defrauding the United States of tax on distilled spirits is a serious crime involving moral turpitude). Thus, we can be confident that Folajtar's offense falls outside "the scope of the Second Amendment's guarantee" to possess firearms, *Marzzarella*, 614 F.3d at 89, and we need not proceed to Step Two of the *Marzzarella* analysis.

27

Our decision, like those of some of our sister circuits, does not adopt a blanket rule categorically foreclosing an as-applied challenge to § 922(g)(1) for a felony conviction, and we do not rule out the possibility of an exceptional federal or state felony unmoored from the bar's historical underpinnings. *See, e.g.*, *Hamilton*, 848 F.3d 614; *Kanter*, 919 F.3d 437; *Medina*, 913 F.3d 152. But that is not the case before us today. Unlike the dissent's examples of felonies, *see* Dissenting Op. 21–22 (noting that opening a bottle of ketchup is a felony in New Jersey, reading another person's email without permission is a felony in Pennsylvania, and uttering obscene language on radio communications is a federal felony), tax fraud, akin to falsifying information on a bank loan application in *Medina*, is a felony that "reflect[s] grave misjudgment." *Medina*, 913 F.3d at 158 (internal quotation marks and citation omitted).

\* \* \* \* \*

Legislatures have always regulated the right to bear arms. *Heller*, 554 U.S. at 626; 1 William Blackstone, Commentaries \*139 (describing the English right to bear arms, which protected the right "of having arms for their defence, suitable to their condition and degree, and such as are allowed by law"); Lawrence Rosenthal, The Limits of the Second Amendment Originalism and the Constitutional Case for Gun Control, 92 Wash. U. L. Rev. 1187, 1210 (2015) (noting that at the Founding laws disarmed certain groups, such as those unwilling to swear allegiance to the Revolution). *Heller* recognizes that the Second Amendment permits a broad bar for felons, and our historical analysis confirms that generally conclusive ban. When Folajtar committed a federal felony of materially misstating her tax liability, a serious crime, she

28

removed herself from the constitutionally protected class of "law-abiding citizens." Thus her claim fails at *Marzzarella* Step One.

The dissent's concern for the rehabilitation of convicted criminals is commendable, and we agree with our dissenting colleague that, as illustrated by nineteenth-century state and federal legislatures' decisions to reduce the use of capital punishment and focus on the rehabilitation of convicted criminals, society need not implement the law according to the outer boundaries of what is constitutional. But the choice society has made in this case, by way of Congress's enactment of the felon-in-possession statute and the tax felony statute under which Folajtar was convicted, lies within those boundaries. Thus, if Folajtar and others in her position wish to seek recourse, it is to the legislature, and not to the judiciary, that their efforts should be directed. We thus affirm.

BIBAS, *Circuit Judge*, dissenting.

Today, the majority holds that the Government may disarm all felons except when it may not. My colleagues endorse a near-categorical rule with a hint of an escape hatch and clothe everything with the authority of *Heller* and *Binderup*. Maj. Op. 6, 10–14. But the clothes do not fit. Neither case decided whether nondangerous felons should lose their Second Amendment rights. And a closer look at the majority opinion shows that it strays from *Binderup*'s method of analyzing as-applied challenges.

To see the majority's missteps, we must be clear about what it holds: It is essentially a blanket ban. When a legislature labels a crime a felony, that label is "generally conclusive," and the Government may disarm felons. Maj. Op. 6. Though in theory a few felonies might be too minor to count, the majority never defines this caveat. All it says is that such felonies are "rare exceptions." Maj. Op. 20.

Yet abdicating to labels is unfaithful to our precedent. The three-judge opinion in *Binderup* scrutinized limits on Second Amendment rights by looking at four factors: whether the crime is violent, whether it is a felony, whether other jurisdictions agree that it is serious, and whether the sentence imposed is severe. 836 F.3d at 351–53. *Holloway* added a fifth factor related to violence: dangerousness. 948 F.3d at 172–77; Maj. Op. 11. And under the five-judge *Binderup* concurrence, we would focus "on the legitimate (*i.e.*, traditional) concern that justifies the dispossession of certain offenders: we cannot trust them not to commit violent crimes with firearms." 836 F.3d at 374. Both tests weigh danger, either directly or through the lens

of violence. Yet today, the majority sets aside dangerousness, violence, the sentence imposed, and cross-jurisdictional consensus.

Instead, the majority shears the multi-factor test in *Binderup* and *Holloway* down to a single factor: whether the legislature labeled the crime a felony. It emphasizes that its rule defers to the legislature and is administratively convenient. These were the same arguments made by the *Binderup* dissent. 836 F.3d at 400–03 (Fuentes, J., dissenting). There, the dissent pushed for a categorical rule like the one the majority adopts today. *Id.* at 388. It rejected the possibility of as-applied challenges. A majority of our Court, however, let as-applied challenges proceed and succeed.

As an original matter, the majority's rule also conflicts with the historical limits on the Second Amendment. Those limits protect us from felons, but only if they are dangerous. Yet the majority endorses a near-blanket ban. It allows disarming virtually all felons, even nondangerous ones, based on two related historical claims: First, it argues that the right to bear arms was limited to the virtuous. Second, it asserts that at the Founding, felons were unvirtuous because they had committed serious, indeed capital, crimes.

Both claims overread the history. The historical touchstone is danger, not virtue. Though the majority relies largely on scholars and other circuits for its theory, its layers and layers of citations are mainly inapt. Most of the historical sources involved people who were dangerous. And most of the articles and cases rely on one another, adopt historical readings rejected by *Heller*, or even repudiate the majority's rule. When

2

one sees through the layers, the emperor is not quite naked, but at most he is wearing a loincloth.

The majority makes no more headway by arguing that felonies are serious. Today, because the felony label is arbitrary and manipulable, many felonies are far less serious than those at common law. Even historically, there is no evidence that all felons were disarmed as part of their punishment. Gun restrictions on those jailed and awaiting execution tell us nothing about criminals who had paid their debts to society and been freed. Most punishments were temporary. We punished the crime, not the criminal. The colonists did not treat ex-cons as a permanently exiled underclass, forever branded "unvirtuous."

The majority's extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label. "Unvirtuousness" based on the felony label is a mushy standard that sets no limit. We must not reflexively defer to that label when a fundamental right is at stake, but rather require narrow tailoring to public safety.

Felons are more than the wrongs they have done. They are people and citizens who are part of "We the People of the United States." U.S. Const. pmbl. So they too share in the Second Amendment "right of the people to keep and bear Arms," subject only to the historical limits on that right. Although Lisa Folajtar was convicted of tax fraud nine years ago, she is not dangerous. Neither the majority nor the Government suggests otherwise. Because she poses no danger to anyone, I respectfully dissent.

## I. THE HISTORY OF THE SECOND AMENDMENT ALLOWS DISARMING ONLY DANGEROUS FELONS

As my colleagues agree, the Second Amendment's scope depends on its history. Historically, limitations on the right were tied to dangerousness. In England and colonial America, the Government disarmed people who posed a danger to others. Violence was one ground for fearing danger, as were disloyalty and rebellion. Though the *Binderup* plurality espoused the virtue theory, the articles and cases that it cited mostly fit the dangerousness test. In any event, those sources rest on one another, promote a reading of the history rejected by *Heller*, or even repudiate the rule the majority adopts today. The right historical test is not virtue, but dangerousness.

## A. Precedent does not settle the historical test for disarming felons

The majority begins with a mistaken premise. The Supreme Court has not addressed the historical pedigree of laws disarming felons. Yet the majority reads *Heller* as upholding the "longstanding prohibitions on the possession of firearms by felons." Maj. Op. 6 (quoting *Heller*, 554 U.S. at 626). But *Heller* limited its remark to "longstanding" bans. Longstanding bans are centuries old, not within living memory. *See Heller*, 554 U.S. at 626 (citing Blackstone and 19th-century cases). The federal felon-in-possession ban, however, did not begin to reach beyond violent crimes until 1961. An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961).

4

*Heller*'s aside also described the bans "as only 'presumptively lawful.'" *Binderup*, 836 F.3d at 350 (opinion of Ambro, J.) (quoting *Heller*, 554 U.S. at 626–27 & n.26). "Unless flagged as irrebuttable, presumptions are rebuttable." *Id.* And its remark was dictum. *Heller* did not and had no occasion to resolve when governments may disarm felons. So like the Seventh Circuit, we should "refuse[ ] to read too much into the [*Heller*] Court's 'precautionary language.'" *Kanter v. Barr*, 919 F.3d at 445 (quoting *Skoien*, 614 F.3d at 640).

Our own cases likewise do not resolve the historical question for felons. The three-judge opinion in *Binderup* expressly left open the issue of disarming felons. 836 F.3d at 353 n.6. Later, a panel in *Beers* read *Binderup* to say that "the historical justification for disarming felons was that they were 'unvirtuous.'" 927 F.3d at 156 (quoting *Binderup*, 836 F.3d at 348), *vacated*, 140 S. Ct. 2758 (2020) (mem.). But *Beers* was vacated, so it is not precedent. And *Holloway* dropped a footnote, relying on the now-vacated decision in *Beers* to "set forth the *Binderup* majority holdings." 948 F.3d at 170–71 & n.5. So that footnote was built on sand that has since washed away. Plus, neither panel decision did a *Marks* analysis of the fractured opinions in *Binderup*. *Marks v. United States*, 430 U.S. 188, 193 (1977). And none of our cases involved felons. *See Beers*, 927 F.3d at 152 (mentally ill persons); *Doe*, 977 F.3d at 274 (same); *Holloway*, 948 F.3d at 168 (first-degree misdemeanant); *see also id.* at 174–75 (stressing that the felony/misdemeanor label is hardly dispositive).

Thus, the issue of disarming felons is open. Precedent does not settle its historical limits. Rather, we must analyze the history ourselves and ask: Were all felons, dangerous and non-dangerous alike, equally excluded from the Second Amendment? No, they were not.

## B. Historically, Second Amendment rights were limited for dangerous—but not nondangerous—felons

The history of felon disarmament is well canvassed by Judge Hardiman's concurrence in *Binderup*, 836 F.3d at 367–74, as well as then-Judge Barrett's dissent in *Kanter*, 919 F.3d at 453–64. Their analyses show that the limit on the Second Amendment right was pegged to dangerousness, not some vague notion of "virtue." I draw heavily on then-Judge Barrett's research below, which goes well beyond the sources in *Binderup*. Both English and early American law, through the Founding, reflected the dangerousness test.

1. *English and early American laws disarmed the dangerous*. Stripping the right to bear arms does have ancient origins. In England, royal officers could seize arms from those who were "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13. And they could seize arms from and imprison "people who [went] armed to terrify the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686), *both quoted in Kanter*, 919 F.3d at 456–57 (Barrett, J., dissenting). Both sources authorized disarming the dangerous.

The American colonies had similar laws. They were particularly fearful of the disloyal, who were potentially violent and

6

thus dangerous. Some colonies, like Virginia and Massachusetts, disarmed Catholics "on the basis of allegiance, not on the basis of faith," "with the intent of preventing social upheavals" and "rebellion." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007); Alexander DeConde, *Gun Violence in America* 22–23 (2001), *both quoted in Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

During the American Revolution, Massachusetts and Pennsylvania disarmed loyalists to the Crown who refused to swear allegiance to the state or the United States to "eliminate[] the opportunity for [them] to violently protest the actions of the [state] government." Cornell & DeDino at 506–07. Connecticut likewise disarmed seditious loyalists because "the welfare of the people was jeopard[iz]ed through the hostile influence of Tories." Gilbert at 281–82. It did so on the advice of the Continental Congress to "secure every person, who, going at large, might in their opinion endanger the safety of the colony or liberties of America." *Id.* at 281. And after Shays's Rebellion, the Massachusetts legislature made rebels "who had taken up arms against the state" swear allegiance and give up their arms for three years before they could be pardoned. Cornell & DeDino at 507–08.

The majority misreads the disarming of loyalists as about virtue, because refusing to swear loyalty was not a dangerous action. Maj. Op. 22–23 & n.11. That misses the point. Loyalists were potential rebels who were dangerous before they erupted

7

into violence. The colonists understandably feared that loyalists endangered both them and the nascent Republic as the loyalists struggled to keep America in the British fold. To ensure peace and safety, the colonies had to disarm them. The touchstone was not virtue, but danger.

2. *The proposals from the state ratifying conventions do not support a broader rule*. Little evidence from the Founding supports a near-blanket ban for all felons. I cannot find, and the majority does not cite, any case or statute from that era that imposed or authorized such bans. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). Instead, the majority cites proposals made during the constitutional ratifying conventions of three colonies. Maj. Op. 23–24. Yet this evidence is thin and mostly consistent with focusing on dangerousness.

New Hampshire limited its proposal to danger. Its convention proposed: "Congress shall never disarm any citizen, unless such as are or have been in *actual rebellion*." 1 Elliott at 326 (emphasis added). Rebels posed a risk of insurrection and so were dangerous.

Massachusetts's convention likewise was concerned about danger. Its proposal, never adopted, would have guaranteed the right to keep arms to "peaceable citizens." 2 Schwartz at 675, 681. "Peaceable" meant "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773), *quoted in Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). Breach of the peace was a "violation of the public peace, as by a riot, affray, or any tumult

8

which is contrary to law, and destructive to the public tranquility." *Breach*, Noah Webster, *An American Dictionary of the English Language* (1828), *quoted in Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). So Massachusetts's proposal would have disarmed those who caused physical disruptions and threatened public safety. It did not refer to "virtue."

The strongest support for a near-blanket exclusion comes from the proposal of the Pennsylvania minority. It would have guaranteed the right of arms "unless for crimes committed, or real danger of public injury from individuals." 2 Schwartz at 665. But that is only one piece of evidence. Read broadly, it would nullify our holding in *Binderup*, which recognized the Second Amendment rights of minor misdemeanants. In any event, the proposal does not clarify the meaning of the Second Amendment: it was suggested by a *minority* of the Pennsylvania ratifying convention that failed to persuade its own state, let alone others. A single failed proposal is too dim a candle to illumine the Second Amendment's scope.

## C. The virtue theory is not supported by history

The majority disregards the traditional dangerousness limitation. Instead, it reads the history as limiting the right to keep and bear arms to those who are virtuous. *See* Maj. Op. 9–10, 24. My colleagues are in good company; many other circuits have adopted that theory too. Even so, it is unfounded.

The majority draws its virtue theory from the *Binderup* plurality, which claimed: "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government

9

could disarm 'unvirtuous citizens.' " 836 F.3d at 348 (alteration in original) (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam)). To support that claim, the *Binderup* plurality cited eight academic articles and decisions of six other circuits. 836 F.3d at 348–49. Though the list looks long and impressive, that impression is misleading. On close inspection, each layer lacks historical support or even undermines the majority's near-categorical rule.

1. *The academic sources have no solid historical foundation for the virtue theory.* Start with the academic sources. They are like the layers of a matryoshka doll, each nested layer successively larger with little at the core. Once we take them apart, none proves that felons' lack of virtue excludes them from the Second Amendment.

To begin, three of the articles collapse into one. The first cites no primary historical sources other than the state ratifying conventions discussed above, and the other two cite that article without adding anything:

- First is Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983) (Kates, *Handgun Prohibition*). Kates writes that "[f]elons simply did not fall within the benefits of the common law right to possess arms" because they faced forfeiture of all goods and usually the death penalty. *Id.* at 266. He also states that the Founders did not "consider[] felons within the common law right to arms or intend[] to confer any such right upon them." *Id.* As support, he cites only the Massachusetts,

10

New Hampshire, and Pennsylvania ratifying conventions. *Id.* at 266 n.267. As discussed, Massachusetts and New Hampshire's conventions did not propose to disarm all felons; Pennsylvania's minority proposal failed to persuade its own convention. Thus, the article does not support its key assertion. And as I discuss below, the status of felons awaiting execution tells us nothing about convicts who have completed their sentences.

- Second is another Don B. Kates, Jr., article: *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986) (Kates, *Dialogue*). Kates writes this time that "the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals)." *Id.* at 146. His only source for this claim? His own previous article. *Id.* at 146 n.19 (citing Kates, *Handgun Prohibition*, at 266). The point remains unsupported.

- Third is Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995). Reynolds quotes Kates's *Dialogue* to show that felons had no right to bear arms. *Id.* at 480 (quoting Kates, *Dialogue*, at 146). He does not discuss any historical sources himself. So the point is still unsupported.

Another three of the articles do not even discuss felons or crimes. These articles also rest on the collective-rights theory that *Heller* rejected:

- Start with David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99

11

Mich. L. Rev. 588 (2000). Yassky asserts that "[t]he average citizen whom the Founders wished to see armed was a man of republican virtue." *Id.* at 626. He bases that assertion on his understanding that the Second Amendment is not an individual right, but one tied to an organized militia. *Id.* at 627. *Heller*, of course, later rejected Yassky's reading of the history. 554 U.S. at 582, 592–602. And Yassky does not discuss felons or crimes.

- Next is Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) (Cornell, *Current Crisis*). Cornell argues that the Founders understood the right to bear arms "as a civic right." *Id.* at 679. Like Yassky, he reads it as limited to "militia service," not as an individual right. *Id.* The right, he says, "was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." *Id.* Thus, as with Yassky, Cornell's collective-rights reading conflicts with *Heller*. Plus, his evidence does not support the conclusion he reaches. He cites Pennsylvania's Test Acts of 1777, which required citizens to take loyalty oaths. *See id.* at 680 (citing Saul Cornell, *Commonplace or Anachronism*, 16 Const. Comment. 221, 229 (1999)). Those who refused were disarmed as "persons disaffected to the liberty and independence of this state." Cornell, *Commonplace or Anachronism*, at 228. That fits the general Founding-era fear that rebels were dangerous. So his evidence does not show that virtue, rather

than danger, was the touchstone. He also does not discuss felons or crimes.

- Last is Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004). Cornell and DeDino write that "the Second Amendment was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue." *Id.* at 492. They read the right as a collective one tied to the militia, not about individual self-defense. *Id.* at 496–98. As with the previous two articles, their reading of the right as collective (not individual) conflicts with *Heller*. And they do not discuss crimes or disarming felons. Nor do they delve into primary sources to show that the colonists excluded nondangerous felons from that right as unvirtuous citizens. Instead, they recognize that the Founders were "deeply immersed in" the English common-law tradition. *Id.* at 492. As discussed, English law disarmed the dangerous, not the unvirtuous.

Finally, two of the articles undermine the virtue theory and the majority's broad ban. Indeed, the first one says that today's result is "next to absurd":

- Consider Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations & Criminological Considerations*, 60 Hastings L.J. 1339 (2009). Kates and Cramer, citing many of the sources above, state that "the right to arms was inextricably and multifariously linked to that of civic *virtu* (i.e., the virtuous citizenry)." *Id.* at 1359

13

(citing Cornell & DeDino at 492; Kates, *Handgun Prohibition* at 231–33; and Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 128 (1986), which does not mention felons or crime). They rely on the Massachusetts ratifying convention as proof that the Founders "would have deemed persons convicted of any of *the common law felonies*" to be unvirtuous. *Id.* at 1360 (emphasis added). But then they say that it would be "next to absurd to suggest" that gun rights should be stripped because of minor felony convictions, like "income tax evasion." *Id.* at 1363. Kates and Cramer's article thus contradicts the majority's rule today.

- The same is true of C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009). It is unclear why the *Binderup* plurality cited this article; it does not even mention virtue. Marshall undermines the virtue theory and the majority's near-blanket ban. He argues that the law stripped the right only from those who posed a "genuine present danger to others." *Id.* at 728. Canvassing primary sources, he maintains that the English right to arms and the common law at the time of the Founding did *not* categorically disarm felons for life. *See id.* at 697, 714–28. True, some felons could be disarmed—but only "to some extent, for some time." *Id.* at 728.

In short, half the articles rest on one another. Not one cites primary sources (apart from the ratifying conventions) that support disarming nondangerous felons; the one that delves

14

into primary sources on that point (Marshall) is to the contrary. Three are not about felons at all. Three rest on collective-rights readings rejected by *Heller*. And two oppose the majority's near-blanket rule. Far from supporting the majority, the scholarship in *Binderup*—the majority's key authority (Maj. Op. 9)—undercuts it.

2. *Other circuits' opinions offer no better grounding for the virtue theory*. The other circuits' opinions relied on by the *Binderup* plurality, and thus the majority, also do not soundly support excluding nondangerous felons based on their lack of virtue. Most rest on the sources discussed earlier or on nothing at all. And though many speak of virtue, they are mostly concerned with dangerousness.

To begin, three opinions did not even endorse the virtue theory:

- In its pre-*Heller* case, the Fifth Circuit never mentioned virtue or cited sources discussing it. It upheld a ban on gun possession because, "[i]rrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others." *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). But it did not delve into the Second Amendment's history, as *Heller* requires. Instead, it stressed that letting felons have guns "would otherwise threaten the security of his fellow citizens." *Id.* So the concern is felons' danger, not lack of virtue.

- The same is true of the First Circuit. Citing several of the scholars above, that court noted that the Founders

15

sometimes spoke in terms of civic virtue. *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (citing Reynolds at 480; Shalhope at 130; Cornell, *Current Crisis*, at 679; Cornell, *Commonplace or Anachronism*, at 233; and the Pennsylvania minority proposal). Yet the First Circuit did not adopt the virtue theory itself, saying only that there was "an ongoing debate" on the issue that it did not have to resolve. *Id.* at 16. It also rightly understood that any historical virtue limitation would rest on whether "a certain class of individuals would pose a serious danger to the public." *Id.* Again, danger is the key.

- In upholding a ban on gun possession by those convicted of domestic violence, the Seventh Circuit never mentioned virtue. *Skoien*, 614 F.3d at 642. And though it cited three sources as support for disarming criminals, none justifies that conclusion as a historical matter. *Id.* at 640 (citing the Pennsylvania minority proposal; Marshall at 700–13; and Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008) (asserting that New Hampshire's proposal must have implicitly excluded criminals without citing any authority for that assertion)). It also argued that categorical restrictions are permissible because "such a *recent* extension [in the 1960's] of the disqualification to non-violent felons (embezzlers and tax evaders, for example) is presumptively constitutional, as *Heller* said in note 26." *Id.* (emphasis added). But footnote 26 said nothing about recent extensions or nonviolent felons. All it said was that "*longstanding* prohibitions on the possession of firearms by felons" are "presumptively lawful." *Heller*,

16

554 U.S. at 627 & n.26 (emphasis added). That is no support for the virtue theory.

Another three of the opinions adopted the virtue theory, though in cases about violent felons or people who posed dangers for reasons apart from criminal records:

- The Seventh Circuit embraced the virtue theory (mixed with dangerousness) in upholding a ban on gun possession by habitual drug users, not felons. *Yancey*, 621 F.3d at 683 (upholding 18 U.S.C. § 922(g)(3)). The ban was needed, it noted, "to keep guns out of the hands of presumptively risky people" and thus "suppress[] armed violence." *Id.* at 683–84. The court analogized habitual drug users to felons, noting their lack of virtue and the greater risk that they will become violent. *Id.* at 684–85. Banning gun possession by nonviolent felons, it admitted, may be "wildly overinclusive." *Id.* at 685. But the court thought that felons as a category are more dangerous, so the government may forbid them to possess guns. *Id.* All that was dicta because the case involved habitual drug users, not nonviolent felons.

- The Eighth Circuit likewise invoked the virtue theory to justify disarming felons. *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011). It rested on the scholarship and ratifying conventions discussed above. *Id.* (citing Kates, *Dialogue*, at 146; Kates & Cramer, at 1359 & n.120; Reynolds at 480–81; and the proposals of the Massachusetts and Pennsylvania minority at their

17

ratifying conventions). And because the felony it addressed was domestic violence, the Eighth Circuit had no occasion to consider nondangerous felons. *See id.*

- Finally, the Fourth Circuit cited the virtue theory as a reason to disarm illegal aliens. *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012). It quoted *Yancey* and *Vongxay* and cited many of the articles and proposals discussed earlier. *Id.* (citing Reynolds at 480; Kates, *Dialogue*, at 143, 146; Yassky at 626; Cornell, *Current Crisis*, at 671; Cornell & DeDino at 506; and the Massachusetts and New Hampshire ratifying conventions). But it connected the virtue rationale to the idea that illegal aliens, having no allegiance to our country, could be considered "disloyal or dangerous." *Id.* at 980. The case was about aliens, not felons. And once again, the touchstone is danger.

Of the other circuits, the Ninth Circuit was the only one to adopt the virtue theory as a reason to disarm all felons. *Vongxay*, 594 F.3d at 1118, *cited in* Maj. Op. 8, 9. Yet it rested on the thin scholarship above. *Id.* (relying on Kates, *Dialogue*, at 146; and Reynolds at 480). It also noted the ongoing historical debate, citing Marshall as to the contrary. *Id.*

In short, all these articles and cases show that the virtue theory is flimsy. Most of the evidence dovetails with dangerousness. The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses. The only piece of historical evidence that comes close to endorsing a ban of all former felons is a Pennsylvania minority proposal that was

18

rejected. None of this proves that the Founders limited the Second Amendment right to virtuous citizens and excluded all felons.

## II. THE CATEGORY OF FELONIES IS MANIPULABLE AND LESS SERIOUS THAN IT WAS

Disarming all felons not only ignores history, but also gives legislatures unfettered power over a fundamental right. Though felons at the Founding obviously could not have guns while jailed and awaiting execution, that does not tell us how to treat felons who serve their sentences and go free. And the label "felony" is too easy for legislatures and prosecutors to manipulate.

### A. The felony label does not entail losing all rights

The majority gives dispositive weight to the felony label because "even as the term evolved and expanded, felonies continued to reflect the category of serious crimes." Maj. Op. 17. Its notion of "seriousness" rests on the harsh penalties felonies used to carry: death, both actual and (some would add) civil. *See* Maj. Op. 14–17. Because a felon would have been executed and would have lost all her rights at the time of the Founding, the majority implies, Folajtar must lose her Second Amendment rights now.

But even before the Founding, the link between felonies and capital punishment was frayed. The American colonies curtailed England's Bloody Code. *See* Stuart Banner, *The Death Penalty: An American History* 6 (2002); David Garland, *Peculiar Institution: America's Death Penalty in an Age of Abolition* 115 (2010). Even crimes that were capital in theory

19

often were not in practice. The colonies carried out the death penalty "pretty sparingly," and "[p]roperty crimes were, on the whole, not capital." Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993). Colonial Pennsylvania, for instance, on average sentenced fewer than two people per year to die and executed only one of those two per year. *Id.* Founding Father, law professor, and Supreme Court Justice James Wilson explained that even though the term "felony" was "very strongly connected with capital punishment," "[a]t the common law, few felonies, indeed, were punished with death." James Wilson, 2 *The Works of James Wilson* 348 (Chicago: James DeWitt Andrews ed., 1896).

As the death penalty became less prevalent, felonies became decoupled from the common-law doctrine of civil death. "Civil death was a state in which a person 'though living, was considered dead.'" *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (quoting Harry David Saunders, Note, *Civil Death— A New Look at an Ancient Doctrine*, 11 Wm. & Mary L. Rev. 988, 988–89 (1970)). For felons, it was "a transitional status in the period between a capital sentence and its execution," used to wrap up the felon's affairs. *Id.* (quoting Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. Pa. L. Rev. 1789, 1797 (2012)). It extinguished most of a felon's civil rights. Chin at 1790.

Because civil death was tied to a death sentence, its meaning had to change as states moved away from capital punishment to imprisonment. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). It had been limited to the time before execution, not designed to run for decades. *Id.* at 460 (citing Chin at 1797). In

20

the end, courts "settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights." *Id.* And for felons sentenced to less than life, the courts understood their rights as "merely *suspended* during the term of the sentence." *Id.* at 461 (citing cases from the New York, California, and Virginia Supreme Courts).

Thus, "[t]he obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.* at 462. We would never say, for instance, that because the state used to execute felons, it may now permanently strip them of their freedom of speech or religion. *Id.* at 461–62. It makes no sense to argue that the historical treatment of felons about to be executed licenses us to strip surviving felons of their rights once they have paid their debts to society. We can and should continue restrictions based on public safety: that is protective, not punitive. But it is harsh to keep stigmatizing ex-cons as "unvirtuous," as if their criminal record will forever remain an indelible stain.

## B. The felony label is vague and manipulable

Most felonies today are far removed from those capital crimes at common law. We often see little rhyme or reason in which crimes are labeled felonies. For instance, a radio talk show host can become a felon for uttering "any obscene, indecent, or profane language by means of radio communication." 18 U.S.C. § 1464. In New Jersey, opening a bottle of ketchup at the supermarket and putting it back on the shelf is a third-

degree felony, punishable by up to five years' imprisonment. *See* Paul H. Robinson et al., *Report on Offense Grading in New Jersey* 3 (2011) (citing N.J. Stat. Ann. §§ 2C:40-17a, 2C:43-6.a(3) (West 2010)). And in Pennsylvania, reading another person's email without permission is a third-degree felony, punishable by up to seven years. Paul H. Robinson et al., *The Modern Irrationalities of American Criminal Codes: An Empirical Study of Offense Grading*, 100 J. Crim. L. & Criminology 709, 719 & nn.44, 46 (2010) (citing 18 Pa. Const. Stat. Ann. § 7613 (West Supp. 2010)).

All this goes to show that today, a felony is whatever the legislature says it is. The category is elastic, unbounded, and manipulable by legislatures and prosecutors. Prosecutors often persuade legislatures to add more crimes to that category to give themselves more plea-bargaining options and leverage. *See* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 523–33, 536–37 (2001). In some states, a defendant's Second Amendment rights might even hinge on how prosecutors choose to prosecute them. In California, "wobbler" laws let prosecutors choose between charging a crime as a felony or a misdemeanor. *Ewing v. California*, 538 U.S. 11, 16–17 (2003) (plurality opinion).

Normally, we would not inquire too deeply into why a legislature passed a criminal statute or picked a punishment. A felony's sentence is "purely a matter of legislative prerogative," subject only to rational-basis review. *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Heller*, 554 U.S. at 628 n.27.

But we defer far less when a fundamental right is at stake. We recognized as much in *Binderup*. There, the Government

argued that maximum sentences alone suffice to prove that defendants can lose their Second Amendment rights. 836 F.3d at 350 (opinion of Ambro, J.). The three-judge opinion rightly rejected that approach. Otherwise, "the Government could make an end-run around the Second Amendment and undermine the right to keep and bear arms." *Id.* at 350–51.

The *Binderup* three-judge opinion also recognized that we must not "defer blindly" to maximum possible punishments because "some offenses may be 'so tame and technical as to be insufficient to justify the ban.'" 683 F.3d at 350–51 (quoting *Torres-Rosario*, 658 F.3d at 113). So it is "important" to look at the sentence imposed on a specific defendant. *Id.* at 352. That is a truer sign of whether a particular crime is "serious" or "minor." *Id.*

Today, the Government proposes the same blanket rule as it did in *Binderup*, just adapted to felonies. The majority now takes its bait. And it tries to have its cake and eat it too, adopting a rule that is somehow supposed to be both clear and flexible. It says that some felonies are so "unmoored from the bar's historical underpinnings" that they might not require disarming a felon. Maj. Op. 28. But all we can glean is that this undefined exclusion is "rare" and "truly exceptional." Maj. Op. 7 n.5, 20, 28. That gives courts zero guidance. In practice, the exclusion may well prove illusory.

Under the majority's extreme deference to felony labels, much will still depend on the vagaries of states' criminal codes. For example, many states treat adultery as a misdemeanor. *See, e.g.*, Fla. Stat. §798.01; N.Y. Penal Law §255.17. In Oklahoma, however, it is a felony punishable by up to five years'

23

imprisonment. 21 Okla. Stat. § 872. And in Pennsylvania, adultery is not even a crime. Even so, under today's near-blanket rule, an Oklahoma adulterer would lose his gun rights in Pennsylvania, though a New York adulterer would not. The Second Amendment right to keep and bear arms should not hinge on such arbitrary, manipulable distinctions.

Setting aside the undefined exception, the majority's near-categorical approach seems simple, clear, and administratively convenient. Yet those are the same advantages that the *Binderup* dissent advanced and the three-judge opinion and concurrence rejected by allowing as-applied challenges. *Compare* Maj. Op. 19–20 *and Binderup*, 836 F.3d at 409 (Fuentes, J., dissenting), *with id.* at 353 n.5 (opinion of Ambro, J.) *and id.* at 357 n.1 (Hardiman, J., concurring).

The majority's near-blanket rule is also far from narrowly tailored. *Heller* mandates heightened scrutiny, not rational-basis review. 554 U.S. at 628 n.27. And either strict or intermediate scrutiny calls for narrow tailoring, not convenient blanket rules. *See Gratz v. Bollinger*, 539 U.S. 244, 275 (2003) (holding that the "administrative challenges" of "providing individualized consideration" do not justify bypassing "narrow[] tailor[ing]"). Legislatures, we have held, must tailor gun restrictions to fit a proper objective: here, public safety. *Marzzarella*, 614 F.3d at 98.

True, legislatures may use careful rules of thumb to classify some felonies as dangerous. For instance, though residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence. *Quarles v.*

24

*United States*, 139 S. Ct. 1872, 1879 (2019); *Harmelin v. Michigan*, 501 U.S. 957, 1002–03 (1991) (Kennedy, J., concurring in part and concurring in the judgment). Disarming burglars and drug dealers makes sense because their past crimes were inherently dangerous. But some tailoring is still essential. The majority errs in adopting a near-blanket rule relying on statistics that lump tax fraudsters together with burglars and drug dealers, tarring all felons as dangerous simply because some are. Maj. Op. 25 (citing *Kanter*, 919 F.3d at 449). Even its supplemental statistics say nothing about criminal records: those statistics fail to distinguish fraudsters who have prior records of violence, burglary, or drug dealing from first-time offenders like Folajtar. Durose at tbl. 2, *cited in* Maj. Op. 25. And stripping a person's fundamental rights based on projected crimes *untethered from past dangerous actions* is a risky game indeed. In any event, we should be wary of blessing a "wildly overinclusive" form of civil death for all felons, far removed from history or danger. *Yancey*, 621 F.3d at 685.

## III. RESTORING FELONS TO SOCIETY IS TIED TO RESTORING THEIR RIGHTS

Finally, felons are people too. A person is not reducible to her worst act. Once she has paid her debt to society, she should have a chance to reenter the community as an equal. Restoring felons to our polity requires restoring their rights.

Judges often play no role in deciding whether to restore certain rights. Because of some laws' text or history, legislatures make many of the judgment calls. Take the Thirteenth Amendment. It authorizes involuntary servitude as punishment for a crime. Or take the Fourteenth Amendment. Section Two of that

25

amendment authorizes legislatures to deprive felons of the vote. *Richardson*, 418 U.S. at 54. Legislatures, not courts, must decide when to take away and when and how to restore these rights. Thus, efforts to restore voting rights are properly before legislatures, not us. *See Felon Voting Rights*, Nat'l Conf. of State Legis. (July 28, 2020), https://www.ncsl.org/research/elections-and-campaigns/felon-voting-rights.aspx.

But when the text or history of a law gives judges a role in protecting that right, or the law or precedent is unclear, we should be slow to bless permanent restrictions divorced from legitimate needs. That is true of the Second Amendment. The text does not define "the people" as "the virtuous" or "non-felons." Nor does its history support disarming nondangerous felons. On the contrary, restoring felons' rights to keep and bear arms is in keeping with our history. In the colonial era, most punishments were temporary. Only a sliver of convicts were executed or exiled. Most faced short-term punishments like warnings, fines, or restitution. Friedman at 37–39; Edgar J. McManus, *Law and Liberty in Early New England: Criminal Justice and Due Process, 1620–1692*, at 167–68, 171, 173–74, 201–10 (1993) (tabulating typical crimes and penalties in seventeenth-century Massachusetts, Connecticut, and Rhode Island).

Once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold. In Middlesex County, Massachusetts, 67 of 73 colonial criminals studied were reintegrated back into society in documented ways: they later served as militia officers, public officials, church elders, and the like. Eli Faber, *Puritan Criminals: The*

*Economic, Social, and Intellectual Background to Crime in Seventeenth-Century Massachusetts*, *in* XI *Perspectives in American History* 137–44 (Donald Fleming ed. 1978) ("Although [the Puritans] subjected offenders to public punishments and church confessions, they did not condemn them to exclusion and isolation for long years to come.").

The Quaker colonies of the Delaware Valley, today Pennsylvania and western New Jersey, likewise readily readmitted convicts to social prominence. A study of more than a thousand criminal charges found that after their convictions, recidivists were about as likely to become church leaders and much *more* likely to hold public office than the general population. William M. Offutt, Jr., *Of "Good Laws" and "Good Men": Law and Society in the Delaware Valley, 1680–1710*, at 186–91 & tbl. 28 (1995) ("[E]ven repetitive charges did not carry a disqualifying stigma."). That historian concluded: "Clearly, the criminal law touched in some way every level of this society; just as clearly such accusations did not ostracize the defendant from further participation in public life." *Id.* at 186.

In short, the colonists recognized no permanent underclass of ex-cons. They did not brand felons as forever "unvirtuous," but forgave. We must keep that history in mind when we read the Second Amendment. It does not exclude felons as an untouchable caste.

\* \* \* \* \*

Lisa Folajtar asks us to treat her as an equal member of society. Though her tax-fraud conviction affects some of her privileges, it does not change her right to keep and bear arms.

As an original matter, the Second Amendment's touchstone is dangerousness. Historically, all citizens enjoyed that right unless they posed a danger. Because she is not dangerous, we should not exclude her from her Second Amendment right.

Even under the multi-factor test, dangerousness, violence, and the sentence imposed are significant. Yet the majority sets aside almost all the factors weighed in *Binderup*. Instead, it attaches near-dispositive weight to the felony label. Historically, it is true that felons had no right to guns while they were jailed and awaiting execution. But that "civil death" does not fit long after a nondangerous felon reenters society. And most felonies today are far less serious than capital crimes.

Nobody claims that Lisa Folajtar poses a danger. Because neither history nor precedent supports disarming her for tax fraud, I respectfully dissent.