J-A07001-24

2024 PA Super 309

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
  :            PENNSYLVANIA
  :
v.  :
  :
  :
RAYQUAN A. FARMER  :
  :
Appellant  :   No. 1153 MDA 2023

Appeal from the Judgment of Sentence Entered February 14, 2023
In the Court of Common Pleas of Dauphin County
Criminal Division at No: CP-22-CR-0004742-2020

BEFORE: STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.*

OPINION BY STABILE, J.:         **FILED: DECEMBER 23, 2024**

Appellant, Rayquan Farmer, appeals from the February 14, 2023 judgment of sentence imposing five to ten years of incarceration for unlawful possession of a firearm, 18 Pa.C.S.A. § 6105. We affirm.

Appellant was on parole for a prior robbery conviction[1] when police received word that Appellant was in possession of a firearm. Police investigated, procured a search warrant, and recovered a .40 caliber Beretta from Appellant's residence. A jury found Appellant guilty of the aforementioned offense at the conclusion of a December 12, 2022, trial. After imposition of sentence, Appellant filed a timely post-sentence motion. In it,

---

* Former Justice specially assigned to the Superior Court.

[1] Appellant and several coconspirators robbed the victim of his wallet at gunpoint. The robbery offense is codified at 18 Pa.C.S.A. § 3701.

he argued that § 6105 violates the Second Amendment to the United States Constitution as applied to him in this case under the United States Supreme Court's analysis in ***New York State Rifle & Pistol Ass'n, Inc. v. Bruen***, 597 U.S. 1 (2022). The trial court ordered briefing on that issue and conducted an *en banc* hearing before the entire Dauphin County bench.[2] On July 20, 2023, the trial court denied Appellant's post-sentence motion. This timely appeal followed.

The constitutionality of § 6105 as applied to Appellant is the only question before us.[3] It is a question of law for which our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Bizzel***, 107 A.3d 102 (Pa. Super. 2014) (noting that the constitutionality of a statue presents a pure question of law), *appeal denied*, 126 A.3d 1281 (Pa. 2015). In an as applied challenge, the court determines whether a law with some permissible applications is unconstitutional as applied to Appellant's actions in this case. ***Spence v. Washington***, 418 U.S. 405, 414 (1974). The Second Amendment governs the people's right to keep and bear arms: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.

---

[2] ***See*** Pa.R.C.P. 227.2.

[3] Appellant's brief addresses only the federal constitution. We have cabined our analysis accordingly.

In ***District of Columbia v. Heller***, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment to the United States Constitution confers an individual right to keep and bear a handgun within the home for self-defense. As we will discuss in greater detail below, the ***Heller*** Court announced a strong presumption that "the right of the people" referenced in the Second Amendment's operative clause "is exercised individually and belongs to all Americans." ***Id.*** at 581. The phrase "the people" as used in the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." ***Id.*** at 580.

Moreover, the Second Amendment codified a "*pre-existing* right," that was conducive to, but not dependent on, an individual's service in a state militia. ***Id.*** at 592-93 (italics in original). This is so because our founding generation knew, from history, that "the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents." ***Id.*** at 598. The protection of an individual's right to self-defense enshrined in several state constitutions also informed the ***Heller*** majority's view of the founding generation's understanding of the right to keep and bear arms. ***Id.*** at 602-03. The ***Heller*** Court reviewed post-ratification commentary (***see id.*** at 605), pre-Civil War case law (***see id.*** at 610), post-Civil War legislation (***see id.*** at 614), and post-Civil War commentators (***see id.*** at 616), finding support for its holding throughout

those sources. But the *Heller* Court also issued some qualifications as to the scope of its decision:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. We shall refer to these four categories—felons, the mentally ill, sensitive places, and commercial sale—as the "*Heller* Exemptions."

Turning to the laws at issue in *Heller*, whereby the District of Columbia prohibited the possession of handguns and required that lawfully owned long guns be rendered inoperable while stored within the home, the Supreme Court held them to be in violation of the Second Amendment.

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.

*Id.* at 628. The High Court held that the handgun ban would fail under any level of scrutiny. *Id.* at 628-29. Likewise, the requirement that lawfully owned guns be rendered inoperable within the home precluded their use for self-defense, and thus violated the Second Amendment right. *Id.* at 630.

Subsequently, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment right to keep and bear

arms for self-defense applies to the states by operation of the Fourteenth Amendment.[4] The **McDonald** Court struck down laws of the city of Chicago and one of its suburbs which, like the laws at issue in **Heller**, effectively banned the possession of handguns.

In **New York State Rifle & Pistol Ass'n, Inc. v. Bruen**, 597 U.S. 1 (2022), the Supreme Court built on **Heller** and **McDonald**, holding that the Second and Fourteenth Amendments confer an individual right to carry a handgun outside the home for self-defense. In so holding, the **Bruen** Court struck down a New York law that forbade the carrying of an unlicensed handgun and required persons seeking a public carry license to establish a special need for self-defense. **Id.** at 8-11.

The New York state courts had upheld the law against the constitutional challenge, reasoning that the licensing requirements were "substantially related to the achievement of an important governmental interest." **Id.** at 17. Similarly, federal circuit courts after **Heller** and **McDonald** "coalesced around a 'two-step' framework for analyzing Second Amendment challenges

---

[4] The Fourteenth Amendment provides, in part, that "No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. A 5 to 4 majority agreed that the Fourteenth Amendment incorporates the Second Amendment right as defined by **Heller**. **McDonald, supra.** Justice Alito, joined by Chief Justice Roberts, Justice Scalia, and Justice Kennedy, relied on the Due Process Clause of the Fourteenth Amendment to reach their result. Justice Thomas relied on the Privileges and Immunities Clause.

- 5 -

that combines history with means-end scrutiny." *Id.* The *Bruen* Court abrogated the means-ends scrutiny portion of the analysis.

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id.* Thus, *Bruen* created a modified two-step analysis. Step one requires consideration of whether the Second Amendment covers the conduct at issue. If it does, step two requires the government to demonstrate that the regulation at issue is consistent with our Nation's historical tradition of firearm regulation.

The *Bruen* Court acknowledged the difficulties of historical analysis but found those difficulties preferable to the empirical judgments and cost-benefit analysis attendant to judicial scrutiny. *Id.* at 25. The historical analysis requires consideration of how and why the law at issue burdens "a law-abiding citizen's right to armed self-defense." *Id.* at 29. The "how" and "why" of the law at issue must comport with the "how" and "why" of a "historical *analogue*, not a historical *twin*." *Id.* at 30 (italics in original). Finally, the *Bruen* Court explained that the Second Amendment does not recognize a "home/public distinction in the right to keep and bear arms." *Id.* at 32. The right to self-defense is a "central component" of the Second Amendment right, and

"[m]any Americans hazard greater danger outside the home than in it." *Id.* at 33.

Applying these principles, the *Bruen* Court held that the respondents failed to identify a sufficient historical analogue for a law requiring citizens to demonstrate a special need to carry firearms in public. *Id.* at 70.

> The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller*, 554 U.S. at 581. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public.

*Id.* In a concurring opinion, Justice Kavanaugh, joined by Chief Justice Roberts, reiterated the *Heller* Exemptions. *Id.* at 81 (quoting *Heller*, 554 U.S. at 626).

Most recently, in *United States v. Rahimi*, 602 U.S. 680 (2024), the High Court upheld a Second Amendment challenge to a federal statute, 18 U.S.C.A. § 922(g)(8), that forbids possession of a firearm to a person subject to a domestic violence order if the order includes a finding that the person "represents a credible threat to the physical safety" of the person's intimate partner. *Id.* at 684. The petitioner in that case argued that § 922(g)(8) was unconstitutional on its face. *Id.* at 689. The Supreme Court disagreed.

"From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 693. The *Rahimi* Court cited surety laws, whereby a person suspected of future misbehavior, including misuse of firearms, was required to post a bond or face jailtime. Those who posted bonds would forfeit the bond in the event of future misbehavior. *Id.* at 695. "Going armed" laws "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify [] the good people of the land.'" *Id.* at 697 (quoting 4 Blackstone 149). Punishment included imprisonment and forfeiture of weaponry. *Id.*

Noteworthy here is the lesson the *Rahimi* Court drew from the surety and going armed laws. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. That is, § 922(g)(8) was sufficiently analogous to the going armed and surety laws in both its "how" – restricting gun possession – and its "why" – because the subject posed a credible threat of violence to another. *Id.* at 698-99.

Against this backdrop, we now turn to the present case. The Commonwealth has forbidden Appellant to possess firearms under § 6105:

> **(a) Offense defined.**—
>
> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use,

> control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.
>
> * * * *
>
> **(b) Enumerated offenses**.—The following offenses shall apply to subsection (a):
>
> * * * *
>
> Section 3701 (relating to robbery).

18 Pa.C.S.A. § 6105(a)(1), (b).[5]

Appellant challenges the constitutionality of this provision as applied to him and argues that the first step under ***Bruen*** is to determine whether Appellant is included within "the people" protected under the Second Amendment. Appellant Brief at 39. The Appellant maintains that excluding people like himself from "the people" protected under the Second Amendment is at odds with ***Heller*** and would produce inconsistent results under our Constitution leading to piecemeal application of rights to different classes of individuals. The Commonwealth, drawing upon the ***Heller*** Exemptions, argues that Appellant, as a convicted felon, is not among those people entitled to protection under the Second Amendment. Commonwealth Brief at 9.

_____

[5] We are mindful that the laws of our General Assembly are presumed to be constitutional, and that one who challenges a law's constitutionality bears a heavy burden to demonstrate that the law "clearly, palpably, and plainly violates the constitution." ***Commonwealth v. Eid***, 249 A.3d 1030, 1041 (Pa. 2021).

We conclude that the **Heller** Court's textual analysis forecloses the Commonwealth's argument. The **Heller** Court began by examining the operative clause to the Second Amendment – "the right of the people to keep and bear Arms shall not be infringed". **Id.** 554 U.S. 578. According to the Court, the first salient feature of the operative clause is that it codifies a "right of the people." **Id.** at 579. After canvassing where and how the use of the term "the people" appears in the Constitution, the Court explained,

> What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in **United States v. Verdugo-Urquidez**, 494 U.S. 259, 265 (1990):
>
> > "'[T]he people' seems to have been a term of art employed in select parts of the Constitution… . [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."
>
> This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and within a certain age range. Reading the Second Amendment as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as **"the people."**
>
> **We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.**

**Heller**, 554 U.S. at 580. (emphases added). **Heller** rejected a construction of the Second Amendment that excluded subclasses of people from within its

- 10 -

"the people" protection. The right under the Second Amendment applies to all "the people", a/k/a "Americans." *Id.* Nonetheless, the Court reaffirmed that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. It was within that context that the Court issued the *Heller* Exemptions, explaining that it was not conducting an exhaustive historical analysis of the full scope of the Second Amendment, and that

> nothing in [its]… opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627. These statements by the Court cannot be reconciled with a construction that categorically excludes "felons" from among "the people" within the scope of the Second Amendment. When these statements are considered together, the reference to "longstanding prohibitions" can only be considered as those which find support within the history and tradition of the Second Amendment as explained in *Bruen*. While the Second Amendment covers all people, the legislature nonetheless may strip a person of that right if the criteria under *Bruen* are satisfied.

And though we believe *Heller* is decisive on this point, we proceed to address the parties' reliance on the Third Circuit's analysis in *Range v. Attorney General*, 69 F.4th 96, 98 (3d Cir. 2023), *vacated and remanded for reconsideration*, *Garland v. Range*, 144 S.Ct. 2706 (2024). There, the Third Circuit, writing prior to the Supreme Court's opinion in *Rahimi*,

- 11 -

considered a case in which the firearm prohibition resulted from a conviction for a false statement on a food stamp application. The Third Circuit in **Range** rejected the Government's contention that only "law-abiding, responsible citizens" are counted among "the people" protected by the Second Amendment. **Range** concluded that under **Heller** and its progeny Bryan Range remained among "the people" despite his 1995 false statement conviction.[6] Thus, the **Range** Court's analysis in its now-vacated opinion supports our conclusion.

The **Range** Court offered four bases for concluding that convicted felons are among "the people" protected by the Second Amendment. First, the criminal histories of the plaintiffs in **Heller**, **McDonald**, and **Bruen** were not at issue in those cases. The references to "law-abiding, responsible citizens" were therefore *dicta*. **Id.** at 101. Second, other Constitutional provisions reference "the people."[7] Range could only be considered as not among "the people" if the meaning of the phrase varied from provision to provision, which it believed the Supreme Court did not intend under **Heller**. **Id.** at 101-02.

---

[6] The **Range** Court ultimately concluded that 18 U.S.C. § 922(g)(1), commonly known as the "felon in possession" law, was unconstitutional as applied to Range because his prior conviction was non-violent. **Id.** at 106.

[7] **Range** observed that U.S. CONST. art. I, § 2 mentions "the people" twice with respect to voting for Congress; U.S. CONST. amend. I, recognizes "the people" as having rights to assemble peaceably and to petition the government for redress; and U.S. CONST. amend. IV protects "the people" against unreasonable searches and seizures.

- 12 -

Third, it is not illogical to conclude that all people have the right to keep and bear arms, though the legislature may constitutionally strip certain groups of that right. *Id.* at 102 (citing *Binderup v. Attorney General*, 836 F.3d 336, 344 (3d. Cir. 2016) and *Kanter v. Barr*, 919 F.3d 437, 452 (7th. Cir. 2019) (Barrett, J., dissenting)).

"Fourth, the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Id.* at 102. The Court was confident that the Supreme Court's references to "law-abiding, responsible citizens", for example, did not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment. The modifier "responsible" only served to undermine the government's argument because it renders the category hopelessly vague. The *Range* Court observed that "[i]n our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Id.* It rejected the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* at 103 (citing *Folajtar v. Attorney General*, 980 F.3d 897, 912 (3d. Cir. 2020) (Bibas, J., dissenting)).

The Commonwealth maintains that the *Range* Court, by engaging in a detailed analysis of the meaning of "the people," elected to disregard the repeated, explicit language of the Supreme Court cautioning against doubting

- 13 -

the presumptive validity of felon-in-possession prohibitions as per the **Heller**

Exemptions. Commonwealth Brief at 13. For all the foregoing reasons,

however, we are convinced based upon **Heller**, **Bruen**, and **Range**,[8] that the

reference to "the people" contained within the Second Amendment does not

categorically exclude felons like Appellant from within its scope.[9] The **Rahimi**

Court's closing remarks buttress our belief that we have correctly interpreted

**Heller** and **McDonald**:

> Finally, in holding that Section 922(g)(8) is constitutional as applied to Rahimi**, we reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'** Brief for United States 6; see Tr. of Oral Arg. 8-11. 'Responsible' is a vague term. It is unclear what such a rule would entail. Nor does such a

_____

[8] The United States Supreme Court could have taken **Range** up to address whether Ranges was one of "the people," but instead vacated **Range** for further consideration in light of its **Rahimi** opinion. **Rahimi** did not analyze whether the petitioner there was one of "the people." It seems unlikely, therefore, that the Supreme Court's vacatur of **Range** requires the Third Circuit to revisit its conclusion that Range is one of "the people" for purposes of the Second Amendment.

[9] We acknowledge that a different panel of this Court very recently issued its opinion in **Commonwealth v. Jenkins**, 2024 WL 5037053 (Pa. Super. December 6, 2024), where it reached the conclusion that, taken together, surety laws and laws disarming vagrants and outlaws offer ample support that the disarmament of a "fugitive from justice" is consistent with the Second Amendment. **Id.** at *8-13. Our analysis does not conflict with **Jenkins**. The defendant in **Jenkins** was not a convicted felon, and therefore like **Rahimi**, the panel did not decide whether the appellant is included among "the people" under the Second Amendment. Presently, Appellant is a convicted felon who posed a threat of violence due to his conviction for committing a felony (robbery) with a firearm. The question presented thus squarely requires that we first examine whether Appellant is among "the people" before addressing whether the government may constitutionally strip him of his right to possess a firearm as demonstrated by the history and tradition of firearm regulation.

> line derive from our case law. In **Heller** and **Bruen**, we used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. **See**, **e.g., Heller**, 554 U. S., at 635; **Bruen**, 597 U.S., at 70. But those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented.

**Rahimi**, 602 U.S. at 701-02[10] (emphasis added).

In summary, we conclude that § 6105 deprives some of "the people" of the right to bear arms. Per step one of **Bruen**, then, § 6105 implicates conduct protected under the Second Amendment.

The remaining question, per step two of **Bruen**, is whether, despite Appellant's inclusion as one of the people protected under the Second Amendment, the legislature may constitutionally strip Appellant him of that right because of his prior robbery conviction. To answer that question, we need to examine whether § 6105, as applied to Appellant, is consistent with this Nation's historical tradition of firearm regulation. We conclude that it is.

The Supreme Court's **Rahimi** opinion,[11] particularly its "how" and "why" analysis with regard to "going armed" laws, provides an avenue for upholding

---

[10] In fact, the Government in its brief to the **Rahimi** Court repeatedly and consistently referred to "law-abiding, responsible" citizens. Brief for United States, *passim.*

[11] The United States Supreme Court decided **Rahimi** after briefing and oral argument in this case. Neither party sought leave to file an additional brief. **See** Pa.R.A.P. 2113(c); Pa.R.A.P. 2501(a).

felon firearms bans such as that of § 6105, at least temporarily.[12] The common law "going armed" laws prohibited the use of dangerous weapons to terrify people and imposed forfeiture of weaponry as a punishment. *Rahimi*, 602 U.S. at 697. Plainly, the experience of being robbed at gunpoint and/or the threat of being robbed at gunpoint by one convicted of having done so in the past is sufficient to cause terror. And § 6105 is strikingly similar to § 922(g)(8), at issue in *Rahimi*, in both how—prohibition of firearm possession—and why—Appellant, based on his criminal history, poses a threat of violence—it restricts Appellant's Second Amendment right. And this case, as distinct from both *Rahimi* and *Range*, involves a criminal conviction for a felony that involved the use of a firearm. Given the United States Supreme Court's treatment of the "going armed" laws in its *Rahimi* opinion, we can safely conclude that our nation does indeed have a history and tradition of disarming people like Appellant. We therefore find that Appellant's constitutional challenge to Section 6105, on an as applied basis, has no merit.

Judgment of sentence affirmed.

---

[12] The firearm prohibition at issue in *Rahimi* was temporary, and the High Court cabined its holding as such. *Rahimi*, 602 U.S. at 702. The constitutionality of the length of Appellant's ban is not before us. We note, however, that under 18 Pa.C.S.A. 6105(c), a person may make application to a court for relief from the disability imposed under § 6105.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/23/2024